**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| RALPH S. JANVEY, IN HIS CAPACITY AS COURT-APPOINTED RECEIVER FOR THE STANFORD INTERNATIONAL BANK, LTD., ET AL., | § § § § § | |
| Receiver, | § § | |
| | § | Case No. 3:11-CV-2788 |
| v. | § § | |
| JAMES K. CONZELMAN AND LIONEL C. JOHNSON, | § § § | |
| Defendants. | § | |

---

**RECEIVER'S COMPLAINT AGAINST**
**JAMES K. CONZELMAN AND LIONEL C. JOHNSON**

---

## SUMMARY

1.      The Court has ordered Receiver Ralph S. Janvey (the "Receiver") to take control of all assets of the Receivership Estate in order to make an equitable distribution to claimants injured by a massive fraud orchestrated by R. Allen Stanford, James Davis, and others.

2.      The Receiver's investigation to date reveals that revenue from the sale of fraudulent certificates of deposit ("CD Proceeds") generated substantially all of the income for R. Allen Stanford, his two associates, James M. "Jim" Davis and Laura Pendergest-Holt, three of Mr. Stanford's companies, Stanford International Bank, Ltd. ("SIB," "SIBL," or "the Bank"), Stanford Group Company ("SGC"), and Stanford Capital Management, LLC (collectively the "Stanford Defendants"), and the many related Stanford entities (collectively, the "Stanford Parties").

3.     From January 2008 to February 2009, James K. Conzelman and Lionel C. Johnson served as Senior Vice Presidents of Government Affairs at Stanford Financial Group Company ("SFGC").   In their respective roles, Conzelman and Johnson acted as political advisors to the Stanford Parties and advocated the legislative initiatives of the Stanford Parties to various members of Congress and political committees.  The Receiver has identified payments of CD Proceeds totaling at least $525,525.03 from the Stanford Parties to Conzelman and at least $393,535.80 to Johnson.  The Receiver sent letters to both Conzelman and Johnson requesting the return of these funds to the Receivership.  To date, neither has returned these funds to the Receivership.

4.     Through this lawsuit, the Receiver seeks the return of the CD Proceeds received directly or indirectly by Conzelman and Johnson in order to make an equitable distribution to claimants.   The investigation is continuing, and should more payments of CD Proceeds to Conzelman or Johnson be discovered, the Receiver will amend this Complaint to assert claims regarding such additional payments.

5.     Conzelman and Johnson did not provide reasonably equivalent value in exchange for the transfers of CD Proceeds to them.  Conzelman and Johnson either performed no services for the CD Proceeds they received; performed services that did not constitute reasonably equivalent value in exchange for the CD Proceeds they received; or performed only services that were in furtherance of the Ponzi scheme, which cannot be reasonably equivalent value as a matter of law.   Conzelman and Johnson, further, cannot establish that they are good-faith transferees.  Both were aware that at least one senator and a national political committee refused to accept donations from the Stanford Parties because of the ongoing SEC investigation into the Stanford scheme.   They were also aware of concerns raised by prospective Stanford clients

regarding the minimal regulatory oversight of SIB.  Conzelman and Johnson also participated in discussions with Stanford's upper management regarding how to respond to allegations of illegal activities raised by two former Stanford employees in July 2008.  Additionally, as Senior Vice Presidents of Government Affairs, Conzelman and Johnson were officers—and thus insiders—at SFGC.  For all of these reasons, Conzelman and Johnson either knew or should have known of the fraudulent nature of the Stanford enterprise.  Thus, they cannot demonstrate objective good faith.

6.     At all times relevant to this Complaint, the Stanford Parties were insolvent, and Defendant R. Allen Stanford operated the Stanford entities in furtherance of his fraudulent scheme.  Each payment of CD Proceeds from the Stanford Parties to Conzelman and Johnson was made with actual intent to hinder, delay, and defraud the Stanford Parties' creditors.

7.     The Receiver seeks a judgment that: (a) CD Proceeds received directly or indirectly by Conzelman and Johnson were fraudulent transfers under applicable law or, in the alternative, unjustly enriched Conzelman and Johnson; (b) CD Proceeds received directly or indirectly by Conzelman and Johnson are property of the Receivership Estate held pursuant to a constructive trust for the benefit of the Receivership Estate; (c) Conzelman and Johnson are liable to the Receiver for an amount equaling the amount of CD Proceeds they directly or indirectly received; and (d) awards attorneys' fees, costs, and interest to the Receiver.

## JURISDICTION & VENUE

8.     This Court has jurisdiction over this action, and venue is proper, under Section 22(a) of the Securities Act (15 U.S.C. § 77v(a)), Section 27 of the Exchange Act (15 U.S.C. § 78aa), and under Chapter 49 of Title 28, Judiciary and Judicial Procedure (28 U.S.C. § 754).

9.     Further, as the Court that appointed the Receiver, this Court has jurisdiction over any claim brought by the Receiver to execute his Receivership duties.

10.     Further, within 10 days of the entry of the Order and Amended Orders Appointing Receiver, the Receiver filed the original SEC Complaint and the Order Appointing Receiver in the United States District Court for the District of Columbia and all other United States District Courts pursuant to 28 U.S.C. § 754, giving this Court *in rem* and *in personam* jurisdiction in every district where the Complaint and Order have been filed.

11.     This Court has personal jurisdiction over Conzelman and Johnson pursuant to FED. R. CIV. P. 4(k)(1)(C) and 28 U.S.C. §§ 754 and 1692.

## THE PARTIES

12.     Plaintiff Ralph S. Janvey has been appointed by this Court as the Receiver for the assets, monies, securities, properties, real and personal, tangible and intangible, of whatever kind and description, wherever located, and the legally recognized privileges (with regard to the entities) of SIB, SGC, Stanford Capital Management, LLC, R. Allen Stanford, James M. Davis, Laura Pendergest-Holt, Stanford Financial Group, the Stanford Financial Group Bldg., Inc., and all entities the foregoing persons and entities own or control, including, but not limited to Stanford Financial Group Global Management and SFGC (the "Receivership Assets").  The Receiver is asserting the claims contained herein in his capacity as Court-appointed Receiver.[1]

13.     Defendant James K. Conzelman resides in Washington, D.C.  Conzelman will be served pursuant to the Federal Rules of Civil Procedure.

14.     Defendant Lionel C. Johnson resides in Washington, D.C.  Johnson will be served pursuant to the Federal Rules of Civil Procedure.

---

[1]     The Receiver's claims in this Complaint are related to the claims on file in Case No. 03:09-CV-0724-N before this Court.  Pursuant to Local Rule 3.3(a), the Receiver has filed a notice of related case concurrently with this Complaint.

## STATEMENT OF FACTS

15.     On February 16, 2009, the Securities and Exchange Commission commenced a lawsuit in this Court against the Stanford Defendants.  On the same date, the Court signed an Order appointing a Receiver, Ralph S. Janvey, over all property, assets, and records of the Stanford Defendants, and all entities they own or control.

### I.     *Stanford Defendants Operated a Ponzi Scheme.*

16.     As alleged by the SEC, the Stanford Defendants marketed fraudulent SIB CDs to investors through SGC financial advisors pursuant to a Regulation D private placement.  SEC's Second Amended Complaint (Doc. 952), ¶ 27.  The CDs were sold by SIB.  *Id.*

17.     The Stanford Defendants orchestrated and operated a wide-ranging Ponzi scheme. Stanford Defendant James M. Davis has admitted that the Stanford fraud was a Ponzi scheme from the beginning.  Doc. 771 (Davis Plea Agreement) at ¶ 17(n) (Stanford, Davis, and other conspirators created a "massive Ponzi scheme"); Doc. 807 (Davis Tr. of Rearraignment) at 16:16-17, 21:6-8, 21:15-17 (admitting the Stanford Ponzi fraud was a "massive Ponzi scheme ab initio").  In fact, this Court recently found that the Stanford fraud was indeed a Ponzi scheme. *See* Case No. 3:10-CV-0346-N, Doc. 109 at 14 ("[T]he Receiver presents his forensic accountant's objectively verifiable—and uncontradicted—evidence showing that the Stanford Defendants operated a Ponzi scheme."), at 56-57 ("The evidence [the Receiver] provides establishes that the Stanford Defendants operated a Ponzi scheme and were therefore insolvent at least as early as 1999 and perhaps much earlier . . . .  Among other things, the Receiver shows that the SIB CD program depended on continued infusions of cash from an ever increasing number of depositors, a 'classic' Ponzi scheme. . . .  The evidence further demonstrates that the Ponzi scheme was comprised of over 100 interrelated entities whose primary, if not exclusive,

source of funding was derived from SIB CDs and that the Stanford Defendants' compensation was generated from the same source."), at 57-58 ("[T]he Receiver thus sufficiently establishes that the Stanford Defendants' operated a Ponzi scheme."); *see also* Case No. 3:09-CV-0724-N, Doc. 456 at 2 ("The Stanford scheme operated as a classic Ponzi scheme, paying dividends to early investors with funds brought in from later investors."), at 11 ("[T]he Receiver presents ample evidence that the Stanford scheme . . . was a Ponzi scheme."), and at 13 ("The Court finds that the Stanford enterprise operated as a Ponzi scheme . . . ."); Doc. 1315 at 10-11 ("The Court previously determined that the Stanford Defendants operated a massive Ponzi scheme that stole approximately $8 billion from an estimated 50,000 investors scattered over more than 100 countries."), and at 14 ("The Stanford Defendants' Ponzi scheme dissipated billions of dollars over its long existence.").

18.     In connection with a temporary injunction sought against certain Stanford brokers, the Fifth Circuit upheld this Court's findings that the Stanford fraud was a Ponzi scheme. *See Janvey v. Alguire*, 647 F.3d 585, 597-98 (5th Cir. 2011) (upholding this Court's Order).   In particular, the Fifth Circuit made several rulings on the nature of the Stanford fraud, as follows:

> We find that the district court did not err in finding that the Stanford enterprise operated as a Ponzi scheme.
>
> *     *     *
>
> The Davis Plea and the Van Tassel Declarations provide sufficient evidence to support a conclusion that there is a substantial likelihood of success on the merits that the Stanford enterprise operated as a Ponzi scheme. . . . The Davis Plea, when read as a whole, provides sufficient evidence for the district court to assume that the Stanford enterprise constituted a Ponzi scheme *ab initio*.
>
> *     *     *
>
> The Receiver carried his burden of proving that he is likely to succeed in his prima facie case by providing sufficient evidence that a Ponzi scheme existed . . . .

\*         \*         \*

> Here, the Receiver provided evidence of a massive Ponzi scheme
> . . . .  The record supports the fact that Stanford, when it entered
> receivership, was grossly undercapitalized.

*Id.* at 597-601.

19.     In marketing, selling, and issuing CDs to investors, the Stanford Defendants repeatedly touted the CDs' safety and security and SIB's consistent, double-digit returns on its investment portfolio.  SEC's Second Amended Complaint (Doc. 952), ¶¶ 32-33.

20.     In its brochure, SIB told investors, under the heading "Depositor Security," that its investment philosophy is "anchored in time-proven conservative criteria, promoting stability in [the Bank's] certificate of deposit."  SIB also emphasized that its "prudent approach and methodology translate into deposit security for our customers."  *Id*. ¶ 34.  Further, SIB stressed the importance of investing in "marketable" securities, saying that "maintaining the highest degree of liquidity" was a "protective factor for our depositors."  *Id*.

21.     In its 2006 and 2007 Annual Reports, SIB told investors that the Bank's assets were invested in a "well-balanced global portfolio of marketable financial instruments, namely U.S. and international securities and fiduciary placements."  *Id*. ¶ 35.  More specifically, SIB represented that its 2007 portfolio allocation was 58.6% equity, 18.6% fixed income, 7.2% precious metals and 15.6% alternative investments.  *Id*.

22.     SGC, operating as a U.S. broker dealer, acted as the primary vehicle for marketing SIB CDs to investors in the United States.  SGC financial advisors sold thousands of SIB CDs.  SGC received commissions, or referral fees, for these sales.  SGC also performed "portfolio management" and other services for SIB relating to the CD investment portfolio and for which it received fees from SIB.  This SIB CD-related income constituted the majority of SGC revenue each year from 2004 through 2008.  During this same time, SGC also received at least

$175,250,000 in capital contributions from Allen Stanford and other Stanford entities in order to offset negative cash flows the company experienced.  These capital contributions were primarily derived from SIB CD Proceeds.

23.     Consistent with its Annual Reports and brochures, SIB trained SGC financial advisors, in February 2008, that "liquidity/marketability of SIB's invested assets" was the "most important factor to provide security to SIB clients." *Id.* ¶ 36.  In training materials, the Stanford Defendants also claimed that SIB had earned consistently high returns on its investment of deposits (ranging from 11.5% in 2005 to 16.5% in 1993). *Id.* ¶ 49.

24.     Contrary to the Stanford Defendants' representations regarding the liquidity of SIB's portfolio, SIB did not invest in a "well-diversified portfolio of highly marketable securities."  Instead, significant portions of the Bank's portfolio were misappropriated by the Stanford Defendants and were either placed in speculative investments (many of them illiquid, such as private equity deals), diverted to other Stanford entities "on behalf of shareholder," *i.e.*, for the benefit of Allen Stanford, or used to finance Allen Stanford's lavish lifestyle (*e.g.*, jet planes, a yacht, other pleasure craft, luxury cars, homes, travel, company credit cards, etc.).  In fact, at year-end 2008, the largest segments of the Bank's portfolio were private equity, over-valued real estate, and at least $1.6 billion in undocumented "loans" to Defendant R. Allen Stanford.  *See id.* ¶¶ 39-40.

25.     In an effort to conceal their fraud and ensure that investors continued to purchase the CDs, the Stanford Defendants fabricated the performance of SIB's investment portfolio.  *Id.* ¶ 4.

26.     SIB's financial statements, including its investment income, were fictional.  *Id.* ¶¶ 4, 53.  In calculating SIB's investment income, Stanford Defendants R. Allen Stanford and

James Davis provided to SIB's internal accountants a pre-determined return on investment for the Bank's portfolio. *Id.* Using this pre-determined number, SIB's accountants reverse-engineered the Bank's financial statements to reflect investment income that SIB did not actually earn. *Id.*

27.     For a time, the Stanford Defendants were able to keep the fraud going by using funds from current sales of SIB CDs to make interest and redemption payments on pre-existing CDs. *See id.* ¶ 1. However, in late 2008 and early 2009, CD redemptions increased to the point that new CD sales were inadequate to cover redemptions and normal operating expenses. As the depletion of liquid assets accelerated, this fraudulent Ponzi scheme collapsed.

28.     Most of the above facts discovered from Stanford's records have since been confirmed by Stanford's Chief Financial Officer, James Davis, who has pleaded guilty to his role in running the Stanford Ponzi scheme.

II.     ***Stanford Transferred CD Proceeds from the Ponzi Scheme to Conzelman and Johnson.***

29.     CD Proceeds from the Ponzi scheme described above were transferred by or at the direction of the Stanford Parties to Conzelman and Johnson. Conzelman and Johnson did not provide reasonably equivalent value for the transfers of CD Proceeds to them and cannot establish that they are good-faith transferees.

30.     From January 2008 to February 2009, James K. Conzelman and Lionel C. Johnson served as Senior Vice Presidents of Government Affairs at SFGC. In their respective roles, Conzelman and Johnson acted as political advisors to the Stanford Parties and advocated the legislative initiatives of the Stanford Parties to various members of Congress and political committees. The Receiver has identified payments of CD Proceeds totaling at least $525,525.03 from the Stanford Parties to Conzelman and at least $393,535.80 to Johnson.

31.     The transfers of CD Proceeds to Conzelman from the Stanford Parties consisted of at least the following: $411,922.56 in Regular Earnings; $58,972.67 in Semi-Annual Bonuses; and $54,629.80 in Expenses.  The transfers of CD Proceeds to Johnson from the Stanford Parties consisted of at least the following: $330,769.01 in Regular Earnings; $39,305.68 in Semi-Annual Bonuses; $20,576.61 in Retro Pay; and $2,884.50 in Vacation Pay.   The investigation is continuing, and should more payments of CD Proceeds to Conzelman or Johnson be discovered, the Receiver will amend this Complaint to assert claims regarding such additional payments.

32.     The Receiver sent a letters to both Conzelman and Johnson requesting the return of these funds to the Receivership.  To date, neither has returned these funds to the Receivership.

## REQUESTED RELIEF

33.     This Court appointed Ralph S. Janvey as Receiver for the Receivership Assets. Order Appointing Receiver (Doc. 10) at ¶¶ 1-2; Amended Order Appointing Receiver (Doc. 157) at ¶¶ 1-2; Second Amended Order Appointing Receiver (Doc 1130) at ¶¶ 1-2.  The Receiver seeks the relief described herein in these respective capacities.

34.     Paragraph 4 of the Order Appointing Receiver, signed by the Court on February 16, 2009, authorizes the Receiver "to immediately take and have complete and exclusive control, possession, and custody of the Receivership Estate and to any assets traceable to assets owned by the Receivership Estate."   Order Appointing Receiver (Doc. 10) at ¶ 4; Amended Order Appointing Receiver (Doc. 157) at ¶ 4; Second Amended Order Appointing Receiver (Doc. 1130) at ¶ 4.  Paragraph 5(c) of the Order specifically authorizes the Receiver to "[i]nstitute such actions or proceedings [in this Court] to impose a constructive trust, obtain possession, and/or recover judgment with respect to persons or entities who received assets or records traceable to the Receivership Estate."   Order Appointing Receiver (Doc. 10) at ¶ 5(c); Amended Order

Appointing Receiver (Doc. 157) at ¶ 5(c); Second Amended Order Appointing Receiver (Doc. 1130) at ¶ 5(c).

35.     One of the Receiver's key duties is to maximize distributions to defrauded investors and other claimants.  *See* Second Amended Order Appointing Receiver (Doc. 1130) at ¶ 5(g), (j) (ordering the Receiver to "[p]reserve the Receivership Estate and minimize expenses in furtherance of maximum and timely disbursement thereof to claimants"); *Scholes v. Lehmann*, 56 F.3d 750, 755 (7th Cir. 1995) (receiver's "only object is to maximize the value of the [estate assets] for the benefit of their investors and any creditors"); *SEC v. TLC Invs. & Trade Co.*, 147 F. Supp. 2d 1031, 1042 (C.D. Cal. 2001); *SEC v. Kings Real Estate Inv. Trust*, 222 F.R.D. 660, 669 (D. Kan. 2004).  But before the Receiver can attempt to make victims whole, he must locate and take exclusive control and possession of assets of the Receivership Estate or assets traceable to the Receivership Estate.  *See* Second Amended Order Appointing Receiver (Doc. 1130) at ¶ 5(b).

**COUNT I:     *The Receiver is Entitled to Disgorgement of CD Proceeds Fraudulently Transferred to Conzelman and Johnson.***

36.     The Receiver is entitled to disgorgement of the CD Proceeds transferred from the Stanford Parties to Conzelman and Johnson because such payments constitute fraudulent transfers under applicable law.  The Stanford Parties made the payments to Conzelman and Johnson with actual intent to hinder, delay, or defraud Stanford's creditors; as a result, the Receiver is entitled to the disgorgement of those payments.  Additionally, the Stanford Parties transferred the funds to Conzelman and Johnson at a time when the Stanford Parties were insolvent, and the Stanford Parties did not receive reasonably equivalent value in exchange for the transfers.

37.     The Receiver may avoid transfers made with the actual intent to hinder, delay, or defraud creditors.  "[T]ransfers made from a Ponzi scheme are presumptively made with intent to defraud, because a Ponzi scheme is, as a matter of law, insolvent from inception."  *Quilling v. Schonsky*, No. 07-10093, 2007 WL 2710703, at *2 (5th Cir. Sept. 18, 2007); *see also Alguire*, 647 F.3d at 597 ("[A] Ponzi scheme 'is, as a matter of law, insolvent from its inception.'"); *Warfield v. Byron*, 436 F.3d 551, 558 (5th Cir. 2006) (". . . [the debtor] was a Ponzi scheme, which is, as a matter of law, insolvent from its inception. . . .  The Receiver's proof that [the debtor] operated as a Ponzi scheme established the fraudulent intent behind transfers made by [the debtor].").  Moreover, "in determining actual intent . . . , consideration may be given, among other factors, to whether . . . the transfer or obligation was to an insider."  TEX. BUS. & COM. CODE ANN. § 24.005(b)(1) (West 2009).  Conzelman and Johnson, as Senior Vice Presidents, were officers of SFGC and thus were insiders with the Stanford entities.  *See* TEX. BUS. & COM. CODE ANN. § 24.002(7) (defining "insider" for the purposes of the fraudulent-transfer statute to include officers and directors of a corporation).  Accordingly, the fraudulent transfers to them were made with the actual intent to hinder, delay, or defraud creditors.

38.     The Stanford Parties were running a Ponzi scheme and paid Conzelman and Johnson with funds taken from unwitting SIB CD investors.  The Receiver, therefore, is entitled to disgorgement of the CD Proceeds the Stanford Parties fraudulently transferred to Conzelman and Johnson.

39.     Consequently, the burden is on Conzelman and Johnson to establish an affirmative defense, if any, of good faith and provision of reasonably equivalent value.  *See* Case No. 3:09-CV-0724-N, Doc. 456 at 13 ("A defendant invoking this defense has the burden to show *both* objective good faith and reasonable equivalence of consideration.") (emphasis in

original); *see also Scholes*, 56 F.3d at 756-57 ("If the plaintiff proves fraudulent intent, the burden is on the defendant to show that the fraud was harmless because the debtor's assets were not depleted even slightly."). The Receiver, therefore, is entitled to recover the full amount of the payments that Conzelman and Johnson received—either directly or indirectly—unless they prove *both* objective good faith *and* reasonably equivalent value.

40.    The good-faith element of this affirmative defense requires that Conzelman and Johnson—both insiders—prove objective, rather than subjective, good faith. *See Warfield*, 436 F.3d at 559-560 (good faith is determined under an "objectively knew or should have known" standard); *In re IFS Fin. Corp.*, Bankr. No. 02-39553, 2009 WL 2986928, at *15 (Bankr. S.D. Tex. Sept. 9, 2009) (objective standard is applied to determine good faith); *Quilling v. Stark*, No. 3-05-CV-1976-BD, 2007 WL 415351, at *3 (N.D. Tex. Feb. 7, 2007) (good faith "must be analyzed under an objective, rather than a subjective, standard. The relevant inquiry is what the transferee objectively knew or should have known instead of examining the transferee's actual knowledge from a subjective standpoint.") (internal citations and quotation marks omitted). Conzelman and Johnson were both aware that at least one senator and a national political committee refused to accept donations from the Stanford Parties because of the ongoing SEC investigation into the Stanford scheme. Indeed, Stanford tasked Conzelman and Johnson with convincing such politicians and committees to accept donations from the Stanford Parties. Both were also aware of concerns raised by prospective Stanford clients regarding the minimal regulatory oversight of SIB. They also participated in discussions with Stanford's upper management regarding how to respond to allegations of illegal activities raised by two former Stanford employees in July 2008. Additionally, as Senior Vice Presidents of Government Affairs, Conzelman and Johnson were officers—and thus insiders—at SFGC. Conzelman and

Johnson both reported directly to Yolanda Suarez, Chief of Staff of Stanford Financial Group Company as well as Secretary and member of the board of directors for Stanford Group Holdings, Inc., and both Conzelman and Johnson were in regular contact with the highest levels of Stanford management.   For all of these reasons, Conzelman and Johnson either knew or should have known of the fraudulent nature of the Stanford enterprise.   Thus, they cannot demonstrate objective good faith.

41.    Conzelman and Johnson did not provide any value—much less reasonably equivalent value—in exchange for the fraudulent transfers they received.   Moreover, both this Court and the Fifth Circuit have held that providing services in furtherance of a Ponzi scheme do not confer reasonably equivalent value.   *Warfield*, 436 F.3d at 555, 560; Case No. 3:09-CV-0724-N, Doc. 456 at 13-14 ("[A]s a matter of law, services provided in the context of a Ponzi scheme do not constitute 'reasonably equivalent value.'").   Furthermore, consideration which has no utility from the creditor's perspective does not satisfy the statutory definition of "value."   *SEC v. Res. Dev. Int'l, LLC*, 487 F.3d 295, 301 (5th Cir. 2007); *In re Hinsley*, 201 F.3d 638, 644 (5th Cir. 2000).   Conzelman and Johnson cannot now claim that, in return for lobbying on behalf of the Stanford fraudulent scheme and helping it endure, they should be entitled to keep the $919,060.83 in CD Proceeds they received from the Stanford Parties.   Conzelman and Johnson cannot meet their burden to establish that they provided reasonably equivalent value for the CD Proceeds they directly or indirectly received from the Stanford Parties and that they received such payments in good faith.   Accordingly, the Receiver is entitled to the disgorgement of those funds.

42.    Moreover, under applicable fraudulent-transfer law, the Receiver is entitled to attorneys' fees and costs for his claims against Conzelman and Johnson.   *See, e.g.*, TEX. BUS. &

COM. CODE ANN. § 24.013 ("[T]he court may award costs and reasonable attorney's fees as are equitable and just.").  As a result, the Receiver requests reasonable attorneys' fees and costs for prosecuting his fraudulent-transfer claims against Conzelman and Johnson.

43.     In order to carry out the duties delegated to him by this Court, the Receiver seeks complete and exclusive control, possession, and custody of the CD Proceeds received by Conzelman and Johnson.

44.     The Stanford Parties, who orchestrated the Ponzi scheme, transferred the CD Proceeds to Conzelman and Johnson with actual intent to hinder, delay, or defraud their creditors.  The Receiver, therefore, is entitled to disgorgement of all CD Proceeds fraudulently transferred to them.  Pursuant to the equity powers of this Court, the Receiver seeks a judgment that: (a) CD Proceeds received directly or indirectly by Conzelman and Johnson were fraudulent transfers under applicable law; (b) CD Proceeds received directly or indirectly by Conzelman and Johnson are property of the Receivership Estate held pursuant to a constructive trust for the benefit of the Receivership Estate; (c) Conzelman and Johnson are liable to the Receiver for an amount equaling the amount of CD Proceeds he directly or indirectly received; and (d) awards attorneys' fees, costs, and interest to the Receiver.

**COUNT II:     In the Alternative, the Receiver is Entitled to Disgorgement of CD Proceeds from Conzelman and Johnson under the Doctrine of Unjust Enrichment.**

45.     In the alternative, the Receiver is entitled to disgorgement of the CD Proceeds paid to Conzelman and Johnson pursuant to the doctrine of unjust enrichment under applicable law.  Conzelman and Johnson received funds that in equity and good conscience belong to the Receivership Estate for ultimate distribution to the defrauded investors and that Conzelman and Johnson received through the taking of undue advantage *vis a vis* Stanford's investors.

Conzelman and Johnson have been unjustly enriched by such funds, and it would be unconscionable for them to retain the funds.

46.     In order to carry out the duties delegated to him by this Court, the Receiver seeks complete and exclusive control, possession, and custody of the CD Proceeds received by Conzelman and Johnson.

47.     Conzelman and Johnson have been unjustly enriched by their receipt of CD Proceeds from the Stanford Parties.  The Receiver, therefore, is entitled to disgorgement of all CD Proceeds they received.  Pursuant to the equity powers of this Court, the Receiver seeks a judgment that: (a) CD Proceeds received directly or indirectly by Conzelman and Johnson unjustly enriched them; (b) CD Proceeds received directly or indirectly by Conzelman and Johnson are property of the Receivership Estate held pursuant to a constructive trust for the benefit of the Receivership Estate; (c) Conzelman and Johnson are liable to the Receiver for an amount equaling the amount of CD Proceeds they directly or indirectly received; and (d) awards attorneys' fees, costs, and interest to the Receiver.

## PRAYER

48.     The Receiver respectfully request a judgment providing that:

(a)   CD Proceeds received directly or indirectly by Conzelman and Johnson were fraudulent transfers under applicable law or, in the alternative, unjustly enriched Conzelman and Johnson;

(b)   CD Proceeds received directly or indirectly by Conzelman and Johnson are property of the Receivership Estate;

(c)   CD Proceeds received directly or indirectly by Conzelman and Johnson are subject to a constructive trust for the benefit of the Receivership Estate;

(d)    Conzelman and Johnson are liable to the Receiver for an amount equaling the amount of CD Proceeds he directly or indirectly received;

(e)    The Receiver is awarded attorneys' fees, costs, and prejudgment and post-judgment interest; and

(f)    The Receiver is awarded such other and further relief as the Court deems proper under the circumstances.

Dated:  October 18, 2011                    Respectfully submitted,

                                            **BAKER BOTTS L.L.P.**


                                            By: /s/ Kevin M. Sadler
                                                Kevin M. Sadler
                                                Texas Bar No. 17512450
                                                kevin.sadler@bakerbotts.com
                                                Scott D. Powers
                                                Texas Bar No. 24027746
                                                scott.powers@bakerbotts.com
                                                1500 San Jacinto Center
                                                98 San Jacinto Blvd.
                                                Austin, Texas 78701-4039
                                                (512) 322-2500
                                                (512) 322-2501 (Facsimile)

                                                Timothy S. Durst
                                                Texas Bar No. 00786924
                                                tim.durst@bakerbotts.com
                                                2001 Ross Avenue
                                                Dallas, Texas 75201
                                                (214) 953-6500
                                                (214) 953-6503 (Facsimile)


                                            **ATTORNEYS FOR RECEIVER RALPH S. JANVEY**

## CERTIFICATE OF SERVICE

On October 18, 2011, I electronically submitted the foregoing document with the clerk of the court of the U.S. District Court, Northern District of Texas, using the electronic case filing system of the Court.  I hereby certify that I will serve James K. Conzelman and Lionel C. Johnson individually or through their counsel of record, electronically, or by other means authorized by the Court or the Federal Rules of Civil Procedure.

/s/ Kevin M. Sadler
Kevin M. Sadler